IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE

Assigned on Briefs November 14, 2017

**STATE OF TENNESSEE v. GEREMY PAUL MATHIS**

**Appeal from the Circuit Court for Coffee County**
**No. 40879     L. Craig Johnson, Judge**

_____

**No. M2017-00166-CCA-R3-CD**

_____

The Appellant, Geremy Paul Mathis, was convicted by a Coffee County Circuit Court Jury of initiating a process intended to result in the manufacture of methamphetamine, a Class B felony. The trial court sentenced the Appellant as a Range I, standard offender to eleven years in the Tennessee Department of Correction. On appeal, the Appellant contends that the trial court erred by (1) denying his motion to suppress the "meth lab" discovered after an officer ordered the Appellant to exit the vehicle in which he was a passenger, (2) denying his motion for mistrial after a defense witness made repeated references to the Appellant's previous incarceration, and (3) refusing to grant the alternative sentence of community corrections. The Appellant further contends that the evidence was not sufficient to sustain his conviction. Upon review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and ALAN E. GLENN, J., joined.

J. Brad Hannah, Smithville, Tennessee, for the Appellant, Geremy Paul Mathis.

Herbert H. Slatery III, Attorney General and Reporter; James E. Gaylord, Senior Counsel; and Charles Craig Northcott, District Attorney General; for the Appellee, State of Tennessee.

**OPINION**

**I. Factual Background**

The Appellant's indictment for initiating a process intended to result in the manufacture of methamphetamine occurred after motel employees discovered components of a "meth lab" in a motel room and notified the police. The police surveilled the motel room and saw the Appellant enter and leave the room. The police then stopped the Appellant's vehicle for a traffic infraction and found a meth lab in a Gatorade bottle in the floorboard of the front passenger's seat.

At trial, Stephanie Snipes testified that on December 1, 2013, she was a "housekeeper/room attendant" at the Baymont Inn. The motel had two floors, and Snipes[1] was assigned to take care of the rooms on one of the floors. Her duties included cleaning, changing linens, and restocking toilet paper and towels. On December 1, she saw a vehicle park behind the motel. Two men exited the vehicle and went to the lobby to check into the motel. She recognized one of the men and knew that his nickname was "Blackie," but she did not recognize the other man. She thought that it was unusual the men parked in the back of the motel because guests normally parked in front of the motel when checking in.

Snipes went to the lobby and briefly spoke with the front desk clerk, Jennifer Reynolds, before going to the second floor to restock her cart. She noticed that after the men checked in, they went upstairs and into room 207. The men were carrying large duffle bags, which Snipes thought was too much luggage for two men. The men left the room twenty or thirty minutes later with bags that appeared to be the same duffle bags they brought with them. Snipes watched them walk down the stairs, through the back parking lot, and toward the nearby Walmart.

Snipes saw the men enter Walmart through the automotive care entrance. She did not see the men carrying the duffle bags into Walmart and surmised that they may have thrown the bags into a dumpster. Snipes said she and Reynolds were the only people working at the motel that night, and she was concerned about their safety. Therefore, she contacted the front desk and told Reynolds about the men's suspicious behavior. Reynolds advised Snipes to be careful but to go about her work.

Snipes continued to clean the rooms. When she was two rooms away from room 207, she smelled "something . . . funny." As she approached the door of room 207, the smell became stronger. Snipes notified Reynolds about the smell, and Reynolds started up the stairs. Before she had reached the top of the stairs, Reynolds detected the smell and returned to the front desk.

---

[1] Presiding Judge John Everett Williams has taken the position that referring to witnesses by their last names, without common titles such as Mr. or Mrs., is disrespectful. However, in referring to witnesses without their titles, we mean no disrespect to the witnesses.

Snipes said she cleaned the rooms around room 207 then went into room 207 "to check their supplies." When she entered the room, the "smell hit[ her] in the face." She worked as quickly as she could because the smell was unpleasant. She noticed that a towel had been rolled up and placed on the floor in front of the bathroom door. She opened the door to check the bathroom supplies and saw a milk jug and a two-liter soda bottle, which were linked by "some kind of tubing," nestled in ice in the bathtub. Both the jug and bottle were "smoking." Snipes immediately left the bathroom, went to the front desk, and told Reynolds what she saw. Reynolds called the police, and, afterward, told Snipes the police were watching the area.

Sometime later, Snipes noticed another vehicle parking in the back parking lot. A man, who was later identified as the Appellant, exited the vehicle, went upstairs to room 207, and "got what was in the bathtub out and [took it] with" him.

On cross-examination, Snipes said that she thought the two men who rented room 207 "looked suspicious before they did anything." A woman was in the vehicle with the two men, but she never got out of the vehicle at the motel. Snipes could not recall if the woman walked to Walmart with the men.

Snipes said that Reynolds and the police advised Snipes not to enter the room again because it could be harmful. She agreed that she found the items in the bathtub before the Appellant went into the room. She recalled that the Appellant arrived in a car with two women. One of the women was driving, and the other was sitting in the back seat. Snipes thought the woman in the backseat was the same woman she had seen with the two men earlier. Snipes estimated that the Appellant was in the motel room approximately two to five minutes and said that she thought he was carrying something when he left.

Jennifer Reynolds testified that on December 1, 2013, she was the front desk clerk at the Baymont Inn. That day, Mark Sain came in and asked for a room with one bed for two people. As part of the check-in procedure, Reynolds made a copy of Sain's identification and asked for the license plate number of his vehicle. Sain responded that he had been dropped off at the motel and did not have a vehicle. Sain paid in cash, and Reynolds gave him two keys to room 207. Sain then left the lobby.

Reynolds said that later, a couple of housekeepers came by the front desk and asked her why she had selected a room with only one queen-sized bed for three guests. Reynolds responded that the registrant had told her only two guests would be sharing the room. Thereafter, a guest in an adjacent room came to the front desk and asked to be moved to another room because her husband, who "had been in trouble with the law," knew the occupants of room 207.

Subsequently, one of the housekeepers asked Reynolds to come to the second floor because she smelled something coming from room 207. The men were still in the room, so Reynolds did not enter the room, but she approached the door and noticed "a cat pee smell" coming through the closed door. Reynolds said that she could identify the smell immediately because she had been married to a police officer. Reynolds called the police from the lobby. During the call, the housekeeper contacted Reynolds and told her the men were leaving the motel. Reynolds went to the back door and saw two men and a woman walk across the motel's parking lot toward the automotive care department of Walmart. Sain glanced back in Reynolds' direction. She did not want him to see her watching and returned to the lobby.

Shortly thereafter, an officer contacted Reynolds, and she told him what she had seen and smelled. After the call, the housekeeper decided to go into room 207, and Reynolds accompanied her. The bathroom door was closed, and a towel was placed in front of the door. Both women began coughing because of the smell in the room, and Reynolds suggested they leave so they would not get sick. The housekeeper opened the bathroom door slightly and told Reynolds what she saw. Reynolds "knew then what it was," and they left the room and closed the door. They went downstairs to wait for the police; however, because it was getting late, Reynolds told the housekeeper to finish cleaning her rooms.

While the housekeeper was cleaning rooms, she radioed Reynolds and reported that a PT Cruiser was in the motel's parking lot and that a man had exited the vehicle and was walking up the back stairs. Reynolds asked the housekeeper to watch the man, and the housekeeper reported that the man returned to the vehicle with "something in his hands." As the vehicle left the parking lot, it ran over a curb. Reynolds opined that "you'd have to be in a hurry to run over that curb." Reynolds sent the officer a text message that the vehicle had left the motel. Eventually, the police searched room 207.

On cross-examination, Reynolds said that she thought the smell coming from room 207 was methamphetamine. Reynolds did not see Sain with a duffle bag when he checked in but did see him carrying a duffle bag when he left the motel.

George Dodson, an officer with the Tullahoma Police Department, testified that around 2:35 or 2:40 p.m. on December 1, 2013, he was dispatched to the Baymont Inn to investigate a complaint of a possible meth lab in one of the motel rooms. Officer Dodson and Officer Kevin Smith each parked a marked patrol car in a lot across the street from the motel so they could watch the motel room. Officer Dodson called Reynolds to tell her about the surveillance, and Reynolds told him that "a strong odor" was coming from room 207 and that a housekeeper had entered the room and had seen a white jug and some tubing in the bathtub. Reynolds told Officer Dodson that the occupants had left the room and walked toward Walmart.

- 4 -

During the officers' surveillance, a white PT Cruiser drove into the motel's parking lot. The Appellant got out of the front passenger's seat of the vehicle, went into room 207 for a minute or two, and returned to the vehicle. Officer Dodson did not see the Appellant carry anything into or out of the room.

The officers followed the vehicle when it left the motel's parking lot. Officer Smith drove beside the vehicle and notified Officer Dodson that the Appellant was not wearing a seat belt. Officer Dodson then initiated a traffic stop. Officer Dodson approached the driver's side of the vehicle, and Officer Smith approached the passenger's side. Both officers saw the Appellant "shuffling around and moving around" and thought he was trying to conceal something or get to a weapon. The officers stopped, and Officer Smith ordered the Appellant to exit the vehicle. When the Appellant complied, Officer Dodson went to the passenger's side to assist Officer Smith. Officer Smith told Officer Dodson that he saw a "possible meth lab [inside a Gatorade bottle] in the front passenger floorboard." The officers took the Appellant into custody and placed him in the back of Officer Dodson's patrol car. The officers then asked June Tyler, who was the driver and owner of the vehicle, and Shirley Russell, who was in the backseat, to exit the vehicle.

One of the officers took the clear Gatorade bottle from the floorboard and placed it on top of the vehicle. "Inside the bottle was a white substance, like a crystal type substance at the bottom of the bottle with clear liquid on top." The officers notified the Tullahoma Fire Department. Officer Dodson said that while waiting for the fire department, he saw the "bottle expanding, kind of pulsing." Officer Dodson said that from his experience and training, he was able to identify the plastic Gatorade bottle as "a one-pot cook, a shake and bake method" of making methamphetamine, and he agreed that it was "an active attempt to make methamphetamine."

After the fire department arrived, Officer Dodson transported the Appellant to the Coffee County Jail and obtained a search warrant for room 207. Officers Dodson and Smith and "the guy that disposes of the meth labs" entered room 207. In the bathtub, they found a white, one-gallon bottle of muriatic acid and a clear, twenty-ounce Sundrop bottle with some type of liquid inside. The officers also found some tubing, a syringe, and a baggie containing white salt, all of which were components commonly used in manufacturing methamphetamine.

On cross-examination, Officer Dodson acknowledged that prior to the traffic stop he knew that room 207 was rented by Sain and that Sain, "Blackie" Nunley, and a woman were in the room when the odor was first detected. Officer Dodson did not know of any investigation involving Sain and Nunley. Officer Dodson estimated that five to ten minutes elapsed between the time the Appellant left the motel room and the traffic stop. When the Gatorade bottle was found in the vehicle, the officers "assumed" it belonged to

the Appellant, not the other occupants of the vehicle. Officer Dodson acknowledged that the police did not attempt to find fingerprints on the Gatorade bottle.

Officer Dodson said that when he went into room 207, the odor of methamphetamine was slight because of the length of time since the call. He did not see any tubing connecting the bottles.

Officer Dodson said that he was not involved in the search of the vehicle. He knew, however, that the vehicle was searched twice and that the second time, "leftovers" from a meth lab were found under the front passenger's seat. Officer Dodson acknowledged that he could not say definitively who "mixed the items" for either the meth lab found in the motel room or the one found in the vehicle.

Kevin Smith testified that he was an officer with the city of Fort Payne, Alabama; however, on December 1, 2013, he was an officer with the city of Tullahoma. He testified consistently with Officer Dodson regarding the reasons for the surveillance on room 207 and about seeing the Appellant arrive in a white PT Cruiser, go into room 207 for a brief time, and then leave. Officer Smith recalled that the Appellant did not carry anything into the room; however, he could not recall if the Appellant carried anything out of the room but thought "[i]t seem[ed] like he did."

When the vehicle left the motel, the officers pursued the vehicle, and Officer Smith noticed the Appellant was not wearing a seat belt. Officer Smith informed Officer Dodson, and Officer Dodson stopped the vehicle. The stop occurred in a bank's parking lot approximately a quarter of a mile from the motel. Officer Dodson approached the driver's side, and Officer Smith approached the passenger's side. As the officers approached, Officer Smith noticed the Appellant "making furtive movements toward the floorboard of the vehicle, the front seat of the vehicle . . . like he was stuffing something." Officer Smith "went directly to the door and got [the Appellant] out." When the Appellant exited the vehicle, Officer Smith saw a "Gatorade-size type bottle" in the floorboard of the front passenger's seat. The bottle appeared to contain "a shake and bake meth lab." Officer Smith explained that he had seen several meth labs during his career. After the Appellant was out of the vehicle, Officer Smith advised Officer Dodson that they should get all of the occupants out of the vehicle for safety reasons. The Appellant was placed in a patrol car, and the two women, who Officer Smith described as "elderly," got out of the vehicle.

The officers contacted the Tullahoma Fire Department, and, while waiting for the the fire department to arrive, they notified the drug task force and "the meth task force people." Officer Smith thought he and Officer Dodson left the Gatorade bottle in the car. Officer Smith remained on the scene while the cleanup took place, and Officer Dodson

transported the Appellant to jail. Officer Smith was not involved in the search of the motel room.

On cross-examination, Officer Smith said that he did not recall if he knew before the traffic stop that Sain had rented the room, but he knew that Officer Dodson had spoken with the motel's general manager before the stop. Officer Smith said that he "ha[d] no idea" that Sain had been in the PT Cruiser before the Appellant was arrested or that the woman in the backseat of the vehicle may have been in room 207 earlier that day. He acknowledged that the police did not search the women, explaining, "[W]e do not search females unless it was for a weapon type situation."

Officer Smith estimated that the Gatorade bottle was a "20- or 30-ounce bottle." He thought the bottle belonged to the Appellant because "[i]t was at his feet." Officer Smith said the initial search of the vehicle was quick because the authorities wanted to deal with "the situation with the lab in there." After the lab was cleaned, the vehicle was searched a second time, and another lab was found. The women in the vehicle were allowed to leave the scene. Officer Smith acknowledged that he did not know who mixed the chemicals that were in the bottle.

On redirect examination, Officer Smith stated that he saw the Gatorade bottle between the Appellant's feet before the Appellant got out of the vehicle and that it was "[r]ight at [the Appellant's] feet, . . . it was literally within a hand's reach of him at his feet."

Chris Boyd testified that on December 1, 2013, he was a truck driver for the meth task force. He said that the function of the meth task force was to go to the scene, neutralize the lab, and transport it to "the haz-mat." Boyd said that he had taken a 40-hour class and was "lab-certified" in identifying, assembling, and deactivating meth labs.

When the task force arrived at the bank's parking lot, Boyd saw a bottle sitting on top of a vehicle. Boyd could tell that methamphetamine components were inside the bottle and that the process of making methamphetamine had started because the substances inside the bottle were "bubbling," which indicated the lab was "working" and "active" and was "actually cooking." Boyd opened the top of the bottle "and let it finish working" in order to "burn off" the product and "let it breathe" so it would deactivate. After a minute or two, Boyd disassembled the components and put each component into a separate container, including Coleman fuel, lithium, and ammonium nitrate. Boyd confirmed that by state law, all of the materials involved in the production of methamphetamine had to be destroyed. He agreed that he had no doubt that "an active meth cook" was taking place in the Gatorade bottle.

Afterward, the meth task force went to the motel room. Boyd said that nothing in the room had to be deactivated but that he had to dispose of muriatic acid he found in a Sundrop bottle.

On cross-examination, Boyd said that it took time to combine all the components to make methamphetamine. He stated that if the process smelled like cat urine, it could indicate someone was "gassing off" a meth lab but that it did "not necessarily" mean that muriatic acid had been added to the mixture. Boyd thought the muriatic acid in the motel room was ready for use but had not yet been used. Boyd had never seen a meth lab placed in ice to control the chemical reaction. Boyd said that the items found in the motel room could be used to make the substance found in the Gatorade bottle and that the items went "along with" the meth lab found in the vehicle. Boyd did not know who mixed the components in the bottle.

Aubrey Wendell Norton, a deputy with the Coffee County Sheriff's Department, testified that on December 1, 2013, she was a member of the meth task force. She said that she received "basic meth lab training" and "container training." Additionally, she "was also instrumental for developing the system that we use to process meth labs, . . . taught several classes on meth labs[, and] . . . was in charge of instructing law officers in the safe handling of meth labs."

Deputy Norton stated that she was not on the scene on December 1, 2013, but that she was present to testify regarding the manufacture of methamphetamine. To prepare for her testimony, she looked at photographs of the meth lab found in the vehicle, read the documents listing the items Boyd took into evidence, and met and spoke with the assistant district attorney and Officer Dodson.

Deputy Norton said that methamphetamine could be made in different ways but that the most common way was "the one-pot method," which was referred to as "the shake and bake method." Deputy Norton stated that numerous components were necessary for the manufacture of methamphetamine, such as pseudoephedrine pills, ammonium nitrate, sodium hydroxide, Coleman fuel, a lithium strip, and a small amount of water. She described how the components were mixed then poured into a container, such as a Gatorade or Sundrop bottle. Deputy Norton said that "you can have some meth as easy as 45 minutes, but most of the time, it is an hour and a half to two hours to get your meth off of it." She said that during the cooking process, the person making the methamphetamine needed to do two things: (1) "burp" the bottle to keep the pressure inside the bottle from becoming "volatile" and (2) move the bottle to prevent a crust from forming inside the bottle. She opined that the meth lab found in the floorboard was near the end of the process, which meant the bottle needed to be burped every ten to twenty minutes. She found no indication that the bottle had been left unattended for forty-five

minutes.  Deputy Norton noted that it was common for one person to work with others to make methamphetamine.

On cross-examination, Deputy Norton said that she had never seen anyone use ice to try to control the chemical reaction of the methamphetamine manufacturing process but that she had seen "hand warmers" employed to "speed up the process."  She said that when she reviewed photographs relating to the instant case, she saw a pill crusher but that she did not know where the pill crusher was found.  She also saw photographs of tubing; salt; and a bottle containing muriatic acid, which typically was used in the last step of making methamphetamine.

She explained that the last stage of the methamphetamine manufacturing process, which was gassing off the meth lab, produced an "ammonia-type smell," which could smell like cat urine.  She acknowledged that, depending on the amount of product being gassed off, the smell could be strong enough to be detected through a door.  She acknowledged that if the process in the Gatorade bottle was still active when it was placed on top of the vehicle, it would have needed to be burped to be safe.

June Tyler was the only witness for the Appellant.  She recalled driving to the Baymont Inn in December 2013 in a PT Cruiser with the Appellant and a woman named Shirley, who had since passed away.  Tyler said the Appellant went to a motel room to see the wife of his friend, Mark Sain.  The Appellant was not at the motel long.  When he discovered that Sain's wife was not in the room, he immediately returned to Tyler's vehicle.  Tyler did not see the Appellant with any bottles or jugs.

Tyler recalled that the police stopped her a few seconds after she left the motel and that she parked her vehicle in front of a church.  The police had Tyler and Shirley sit near the church while they searched the vehicle.  Tyler thought the search lasted a long time "because we like to froze."  During the search, one of the officers brought something to her and asked if she knew what it was.  She responded that she did not.  She stated that she had not seen the Appellant with the item.

Tyler said that eventually, the police allowed her and Shirley to drive home in the vehicle.  Thirty minutes to one hour later, the police came to her house and requested permission to search her vehicle again.  She consented to the search.  During the search, she heard one of the officers say, "'Look what I found, another one.'"

Tyler agreed that Sain had been in her vehicle another time that day for at least thirty minutes, that he sat in the back seat on the passenger's side, and that he had a bag "or some kind of something with him."

On cross-examination, Tyler stated that she had known the Appellant for twenty years and that they were not in an "intimate" relationship in December 2013. She acknowledged, however, that at the time of trial they were in "[a] boyfriend-girlfriend type relationship" and were living together. She explained that their relationship had developed "over the years" and that she had helped him and "bought food for him when he was in jail." When asked if they were living together in December 2013, Tyler responded that he was staying with her and with other friends at that time.

Tyler acknowledged that she saw the Appellant regularly in November and December 2013 and that he came to her home; however, she could not remember if she saw him on a daily basis. She maintained that she never gave him the keys to her vehicle but conceded that if the doors were not locked, the Appellant could get into her vehicle. She stated that Sain came to her house "[e]very once in a while" but not as often as the Appellant.

Tyler said that she was eighty years old and that the Appellant was much younger than she. She asserted that she had never given the Appellant money but conceded that she had provided him with food, shelter, and transportation.

Tyler said that she did not recall driving Sain to the Baymont Inn. The first time she went to the motel that day was when she took the Appellant to check on Sain's wife. Tyler did not give the Appellant a key to the room and did not see if the Appellant went into the room.

Tyler acknowledged that she had heard the phrase "one-pot or shake and bake method" but said that she did not know what it meant and that she had never made methamphetamine. She was never aware of methamphetamine being cooked in her vehicle and did not think Sain had a "meth cook" in her car. Tyler then said that she remembered taking Sain to the Baymont Inn to pick up his wife at some point but acknowledged she could not remember which day it was and that "those could be two separate, completely unrelated events." Tyler maintained that she had a clear memory of some things but was not certain about other things.

On redirect examination, Tyler stated that she believed Sain was in her vehicle the same day the Appellant was arrested.

At the close of the proof, the jury convicted the Appellant of initiating a process intended to result in the manufacture of methamphetamine, a Class B felony. The trial court sentenced the Appellant as a Range I, standard offender to eleven years in the Tennessee Department of Correction. On appeal, the Appellant contends that the trial court erred by denying his motion to suppress, denying his motion for mistrial, and

refusing to sentence him to community corrections. The Appellant further contends that the evidence was not sufficient to sustain his conviction.

## II. Analysis

### A. Motion to Suppress

On appeal, the Appellant contends that the trial court should have granted his motion to suppress, arguing that the officer's actions exceeded the scope of the stop when the officer asked the Appellant to exit the vehicle. The Appellant argues that he should have been cited and released for the misdemeanor offense of failing to wear a seat belt. The State responds that the trial court correctly ruled that the officer's actions were justified and properly denied the motion to suppress. We agree with the State.

Generally, when this court reviews a trial court's determinations regarding a suppression hearing, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact[, and . . .] a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). Regardless, appellate courts will review the trial court's application of law to the facts purely de novo. See State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001). The prevailing party is "entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." Odom, 928 S.W.2d at 23. Moreover, "in evaluating the correctness of a trial court's ruling on a pretrial motion to suppress, appellate courts may consider the proof adduced both at the suppression hearing and at trial." State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998).

Both the Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution provide protection for citizens against "unreasonable searches and seizures." A warrantless search is considered presumptively unreasonable, thus violative of constitutional protections. See State v. Walker, 12 S.W.3d 460, 467 (Tenn. 2000); see also State v. Hicks, 55 S.W.3d 515, 527 (Tenn. 2001). "Accordingly, 'under both the federal and state constitutions, a warrantless search or seizure is presumed unreasonable, and evidence discovered as a result thereof is subject to suppression unless the State demonstrates that the search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement.'" State v. Smith, 484 S.W.3d 393, 400 (Tenn. 2016) (quoting State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997)); see also Coolidge v. New Hampshire, 403 U.S. 443, 454-55 (1971).

The United States Supreme Court announced one such exception to the warrant requirement in Terry v. Ohio, 392 U.S. 1, 21 (1968), holding that a law enforcement

- 11 -

officer may conduct a brief investigatory stop of an individual if the officer has a reasonable suspicion based upon specific and articulable facts that a criminal offense has been, is being, or is about to be committed. See also State v. Keith, 978 S.W.2d 861, 865 (Tenn. 1998). This standard also applies to the investigatory stop of a vehicle. Delaware v. Prouse, 440 U.S. 648, 663 (1979); State v. Watkins, 827 S.W.2d 293, 294 (Tenn. 1992). "Reasonable suspicion is a particularized and objective basis for suspecting the subject of a stop of criminal activity." State v. Binette, 33 S.W.3d 215, 218 (Tenn. 2000) (citing Ornelas v. United States, 517 U.S. 690, 696 (1996)). In evaluating the validity of an investigatory stop, a court must consider the totality of the circumstances. United States v. Sokolow, 490 U.S. 1, 8 (1989); Watkins, 827 S.W.2d at 294. These circumstances include, but are not limited to, "[the officer's] objective observations, information obtained from other police officers or agencies, information obtained from citizens, and the pattern of operation of certain offenders." Watkins, 827 S.W.2d at 294.

In the instant case, Officer Dodson had probable cause to justify the traffic stop after Officer Smith saw that the Appellant was not wearing a seat belt while the vehicle in which he was a passenger was in motion. See Tenn. Code Ann. § 55-9-603(a)(1) and (2); State v. Donaldson, 380 S.W.3d 86, 92 (Tenn. 2012) (stating that an automobile stop is constitutionally permissible when an officer has reasonable suspicion or probable cause to believe a traffic violation has occurred regardless of the officer's "ulterior motive[s]" for the stop).

Regarding the Appellant's contention that he had a presumptive right to be cited and released for the misdemeanor offense of failure to wear a seat belt, we note that a person stopped for a misdemeanor offense generally should be issued a citation and released instead of being taken into custody. Tenn. Code Ann. § 40-7-118(b)(1); see Walker, 12 S.W.3d at 464. However, "for officer safety reasons, a lawful traffic stop authorizes officers, as a matter of course, to require drivers to exit their vehicles." Donaldson, 380 S.W.3d at 92 (citing Pennsylvania v. Mimms, 434 U.S. 106, 111 n.6 (1977). This holding has been extended to permit "an officer making a traffic stop [to] order passengers to get out of the car pending completion of the stop." Maryland v. Wilson, 519 U.S. 408, 415 (1997); see also State v. Thomas Dewayne Moffatt, No. W2008-01048-CCA-R3-CD, 2009 WL 1643432, at *4 (Tenn. Crim. App. at Jackson, June 12, 2009).

At the suppression hearing,[2] Officer Smith testified that a typical stop involving a citation for failure to wear a seat belt lasted seven to twelve minutes. He recalled that as he approached the passenger's side of the vehicle, he saw the Appellant making "furtive movement[s], . . . like he was putting something down in the floor." He had the

---

[2] Officers Smith and Dodson's testimony at the suppression hearing was, for the most part, consistent with their trial testimony.

Appellant get out of the car and saw the meth lab in the floorboard. He asserted that he saw the bottle in plain view approximately thirty seconds to one minute into the stop. On cross-examination, Officer Smith stated that he had the Appellant get out of the car "primarily" because he had been seen going out of the room at the Baymont Inn that contained a possible meth lab and also "for officer safety, for weapons and such as that."

Our supreme court has cautioned that during an investigatory traffic stop, an officer's actions must reasonably relate to the circumstances prompting the stop. State v. Troxell, 78 S.W.3d 866, 871 (Tenn. 2002). Additionally, the detention must not last longer than needed to effectuate the reason underlying the stop, with the officer "'diligently pursu[ing] a means of investigation that was likely to confirm or dispel their suspicions quickly.'" Id. (quoting State v. Simpson, 968 S.W.2d 776, 783 (Tenn. 1998)).

None of the proof at the suppression hearing or at trial reflects that the officers detained the Appellant longer than necessary. Generally, after a traffic violation, a driver can expect "'to spend a short period of time answering questions and waiting while the officer checks his license and registration, that he may then be given a citation, but that in the end he most likely will be allowed to continue on his way.'" State v. Berrios, 235 S.W.3d 99, 107 (Tenn. 2007) (quoting Berkemer v. McCarty, 468 U.S. 420, 437 (1984)). In the instant case, Officer Smith, as he was authorized to do, asked the Appellant to exit the vehicle at the beginning of the stop, before any information relating to a citation had been obtained. Officer Smith said that one of his reasons for having the Appellant exit the vehicle was for officer safety, a legitimate reason for the request. Donaldson, 380 S.W.3d at 93. Immediately upon the Appellant's exit, Officer Smith saw the meth lab in the floorboard of the front passenger's seat. We conclude that the trial court did not err by denying the Appellant's motion to suppress.

## B. Motion for Mistrial

The Appellant contends that the trial court erred by denying his motion for a mistrial after Tyler repeatedly informed the jury that the Appellant had been in jail. The State responds that the trial court correctly denied the motion. We agree with the State.

In the instant case, the defense called Tyler as its sole witness. During cross-examination, the State asked if Tyler and the Appellant were romantically involved. She acknowledged that they were in "[a] boyfriend-girlfriend type relationship" and that they had been living together "for just a while here." The State asked if their relationship was the same in December 2013, and Tyler responded that he had not "stayed all night at the house" at that time. Regarding when "the intimate part" of their relationship began, Tyler said that their relationship had developed "over the years" and that she had helped the Appellant and "bought food for him when he was in jail." When asked if they were living together in December 2013, Tyler responded, "Well, he wasn't – no, not 'living

- 13 -

living' because he was – he had been in jail, but I mean, he was with me, but as far as saying this is his home and that's it . . . . Because he had other friends that he stayed with." She conceded that in December 2013, she saw the Appellant at her home "every once in a while" but stated that their relationship had progressed and that she saw him on a daily basis. When asked if the Appellant was living with her currently, Tyler replied, "He's out, yes."

When Tyler began to explain that the Appellant "has to have a place to live that will see . . . ," the trial court sua sponte asked the jury to step out of the courtroom. The court told Tyler, "[D]o not mention again the fact that [the Appellant] was in jail." The court noted that Tyler had mentioned it twice and that her comments "were not in direct responses to any questions" by the State. The court again stated, "Do not mention it again." Tyler then stated, "Well, I don't know. That's where he was." The court said, "I don't want to insinuate or accuse anybody of anything, but you cannot say that in front of the jury again. As long as you understand me now." Tyler stated that she would comply with the trial court's instructions but asked, "What if it has to do with what really has happened?" The trial court explained that if the State "wants to elicit that information from you, [it] will ask the question, and it's on [the State]. It's not for you to interject it, okay?" Tyler responded, "Okay."

When the jury returned to the courtroom, the trial court gave the following curative instruction, "It was mentioned offhand that [the Appellant] may or may not have been in jail at one point in his life. You are to disregard that statement from Ms. Tyler. You cannot consider that as to [the Appellant's] guilt or innocence in this case. Does everybody understand?" After the jury indicated its understanding, testimony resumed.

When the State asked Tyler if she saw the Appellant on a daily basis in November or December 2013, Tyler replied, "Well, I don't want to do anything wrong, but if I can't remember if he was where I said he was or if he was out, how am I going to . . . ." The court interjected and reminded Tyler "that if you can't remember, then all you have got to do is say you can't remember, okay?" Tyler then said that she did not know if she had seen the Appellant on a daily basis during that time frame. The State again inquired about the nature of her relationship with the Appellant, asking if she provided him with "significant financial support." Tyler asserted that she had never given the Appellant money but acknowledged that "when he was – you don't want me to say where, but when he was where he was at, I paid for his food a lot, and I paid for his – so he could call."

Near the end of Tyler's testimony, the State requested a jury-out hearing to determine whether Tyler's statement that the Appellant was a good person opened the door to the admission of the Appellant's prior convictions. The court determined that Tyler's remark was not elicited by either party and that the prior convictions were not admissible. Defense counsel then stated that the Appellant "has asked me to ask for a

- 14 -

mistrial based on you giving a curative instruction, and then she continued to make remarks." The trial court denied the motion for a mistrial, explaining:

> I'm not going to let a witness of the defense declare a mistrial or have a mistrial made. I have already given my inference of what I think is going on here. [The Appellant], if you will listen to me for a minute. I am not going to stand for it. That's why I gave a curative instruction. I am not going to make a mockery of justice.

The State ended its cross-examination of Tyler, and, after a brief redirect examination, she was excused as a witness.

On appeal, the Appellant contends that the trial court should have granted a mistrial because Tyler's repeated references to his time in jail were prejudicial and deprived him of his right to a fair trial. A mistrial should be declared in criminal cases only in the event that a manifest necessity requires such action. State v. Millbrooks, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991). In other words, a mistrial is an appropriate remedy when a trial cannot continue or a miscarriage of justice would result if it did. State v. McPherson, 882 S.W.2d 365, 370 (Tenn. Crim. App. 1994). The burden of establishing the necessity for mistrial lies with the party seeking it. State v. Williams, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996). The decision to grant a mistrial lies within the sound discretion of the trial court, and this court will not interfere with the exercise of that discretion absent clear abuse appearing on the face of the record. See State v. Hall, 976 S.W.2d 121, 147 (Tenn. 1998) (citing State v. Adkins, 786 S.W.2d 642, 644 (Tenn. 1990)). Our supreme court has provided

> the following three nonexclusive factors [to consider] in determining whether a mistrial was warranted because of inappropriate testimony presented to the jury: (1) whether the State elicited the testimony, or whether it was unsolicited and unresponsive; (2) whether the trial court offered and gave a curative jury instruction; and (3) the relative strength or weakness of the State's proof.

State v. Nash, 294 S.W.3d 541, 547 (Tenn. 2009) (citing State v. Smith, 893 S.W.2d 908, 923 (Tenn. 1994)).

The record reveals that initially, the Appellant did not object to Tyler's testimony. Instead, the trial court sua sponte stopped Tyler's testimony, which was not responsive to the State's questioning, and cautioned her not to reference the Appellant's time in jail. The court then gave a curative instruction. Despite the trial court's warning, Tyler made

- 15 -

brief references to the Appellant's being "out" and "where he was at." Again, the Appellant did not lodge a contemporaneous objection and instead chose to wait until the State asked for a jury-out hearing on another matter to request a mistrial. Generally, a failure to contemporaneously object to testimony waives any issues regarding that testimony. See Tenn. R. App. P. 36(a). Moreover, Tyler's remarks were not elicited by the State, and the trial court gave a curative instruction. Generally, we presume that a jury has followed the trial court's instructions. See State v. Butler, 880 S.W.2d 395, 399 (Tenn. Crim. App. 1994). Further, the State's case against the Appellant was strong. Additionally, we note that the trial court indicated it believed Tyler was attempting to intentionally provoke a mistrial. We conclude that the trial court did not err by denying the Appellant's motion for mistrial. Smith, 893 S.W.2d at 923.

## C. Sufficiency of the Evidence

The Appellant contends that the State failed to prove that he "initiated" a process intended to produce methamphetamine and also failed to prove that the meth lab found in the vehicle belonged to the Appellant. The State responds that it adduced sufficient evidence to sustain the Appellant's conviction. We agree with the State.

On appeal, a jury conviction removes the presumption of the appellant's innocence and replaces it with one of guilt, so that the Appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The Appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

The guilt of a defendant, including any fact required to be proven, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. See State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Even though convictions may be established by different forms of evidence, the standard of review for the sufficiency of that evidence is the same whether the conviction is based upon direct or circumstantial evidence. See State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011).

The Appellant was charged with violating Tennessee Code Annotated section 39-17-435, which provides:

> (a) It is an offense for a person to knowingly initiate a process intended to result in the manufacture of any amount of methamphetamine.
>
> (b) It shall not be a defense to a violation of this section that the chemical reaction is not complete, that no methamphetamine was actually created, or that the process would not actually create methamphetamine if completed.
>
> (c) For purposes of this section, "initiates" means to begin the extraction of an immediate methamphetamine precursor from a commercial product, to begin the active modification of a commercial product for use in methamphetamine creation, or to heat or combine any substance or substances that can be used in methamphetamine creation.
>
> (d) Expert testimony of a qualified law enforcement officer shall be admissible for the proposition that a particular process can be used to manufacture methamphetamine. . . .

The Appellant argues that the State failed to prove that he "initiate[d]" the process to manufacture the methamphetamine, emphasizing that he did not begin extracting an immediate methamphetamine precursor from a commercial product, that he did not begin the active modification of a commercial product for use in methamphetamine creation, and that he did not heat or combine any substance(s) that can be used in methamphetamine creation. Specifically, he contends that the items in the motel room were present before he went into the room, that the process takes a minimum of forty-five minutes, that he was stopped within a few minutes of leaving the motel, and that the process in the bottle was "almost done" when the vehicle was stopped. The Appellant maintains that based on the State's timeline, it was impossible for him to have initiated the process in the motel room. He suggests that the process had begun in the motel room before he arrived. In other words, the Appellant's theory was that the meth lab was assembled in the motel room by another person and that he had no part in the "initiat[ion]" process. The Appellant also asserts that the State failed to prove that the meth lab in the vehicle belonged to the Appellant. The evidence belies these contentions.

In the light most favorable to the State, the proof adduced at trial reveals that Sain rented a room at the Baymont Inn, that he and another man went into the room with large duffle bags, and that they later left the room and went to the nearby Walmart. Employees

- 17 -

of the motel noticed a smell like "cat urine" coming from the room, and the components of a meth lab were found in the bathtub. Following a call from the front desk clerk, the police set up surveillance on the room. The officers saw the Appellant, who was the front seat passenger in a vehicle driven by Tyler, arrive at the motel. The Appellant went into the motel room but returned to Tyler's vehicle moments later. The officers followed and stopped the vehicle for a seat belt violation. As the officers approached the vehicle, Officer Smith noticed the Appellant making "furtive" movements as if he were trying to hide something or get a gun. Officer Smith ordered the Appellant out of the vehicle and immediately noticed the meth lab in the floorboard of the front passenger's seat, where the Appellant had been sitting. Both of the women in the vehicle denied knowing anything about the meth lab. See State v. Fayne, 451 S.W.3d 362, 370 (Tenn. 2014) (stating that possession can be actual, which means having physical control over an item, or constructive, which means having the power and intention to exercise dominion and control over an item). The Gatorade bottle was "pulsing," indicating the lab was active, and the officers notified the fire department. Deputy Norton explained that the bottle contained the components to make methamphetamine and that the pulsing indicated the process was ongoing. She stated that the bottle had to be burped fairly frequently to prevent dangerous pressure from building in the bottle. The bottle also had to be shaken to combine the components and encourage the cooking process to continue.

Nothing about the evidence adduced at trial suggests that the meth lab found in the vehicle was assembled in the motel room. No witnesses testified that Coleman fuel, lithium, or ammonium nitrate, which were components of the meth lab, were found in the motel room. Indeed, the State argued at trial that the Appellant brought the bottle to the motel room to seek help "gassing it off." When he found no one in the room, he returned to the vehicle with the bottle. Given the length of time involved in the process, how closely the process had to be monitored, and how near the process was to completion, a reasonable jury could have accepted the State's theory. See State v. Steven Q. Stanford, No. E2010-01917-CCA-R3-CD, 2011 WL 2681961, at *4-5 (Tenn. Crim. App. at Knoxville, July 11, 2011). At a minimum, the State's proof shows that the Appellant had possession of the meth lab and that he was responsible for burping the bottle and shaking it to combine the components and continue the process until it was finished. See State v. Shaw, 37 S.W.3d 900, 903 (Tenn. 2001). Therefore, the Appellant's actions met the statutory definition of "initiates" contained in Tennessee Code Annotated section 39-17-435(c). Although the Appellant argues that the State was required to prove that he was involved in the beginning of the process, this court has never required "initiates" to be so narrowly defined. See State v. David Wayne Phillips, No. W2016-02087-CCA-R3-CD, 2018 WL 486002, at *6 (Tenn. Crim. App. at Jackson, Jan. 19, 2018); State v. Bobby Daniel Pettie, No. M2014-00113-CCA-R3-CD, 2015 WL 351229, at *6-7 (Tenn. Crim. App. at Nashville, Jan. 28, 2015); State v. Franscisco I. Bustamonte, No. M2012-00102-CCA-R3-CD, 2013 WL 1907870, at *12 (Tenn. Crim. App. at Nashville, May 7, 2013). We conclude that the evidence was sufficient to sustain the Appellant's conviction.

## D. Sentencing

On appeal, the Appellant argues that the trial court erred by refusing to sentence him to community corrections. The State responds that the trial court correctly sentenced the Appellant. We agree with the State.

At the sentencing hearing, the State introduced the Appellant's presentence report. Michelle Casteel testified that the Appellant was the father of her fourteen-year-old daughter and that she had known him for thirty-seven years. She said that when the Appellant was sober, he was a good person, had a close relationship with his daughter, and was employed. However, in the past twelve or thirteen years, the Appellant had fallen "very far" into addiction, and she did not know if he could become a productive member of society even if he regained his sobriety.

June Tyler testified that she had been in the Appellant's life for fourteen to eighteen years and that she wanted to remain a part of his life. She was unsure if the Appellant ever had a valid driver's license in the time she had known him. She said that if the Appellant were released, he was welcome to live with her and that she would assist him with anything he needed to do to comply with the terms of release. She said that the Appellant had a bad childhood and that he was a good person. When the Appellant was not in custody, he helped her with household chores and worked. He could "do just about any kind of job. He's a real intelligent person."

On cross-examination, the State asked Tyler if she and the Appellant were still romantically involved, and she responded, "Well, when I'm with him, when I can see him." She acknowledged that she was not aware until the sentencing hearing that the Appellant had five felony and sixteen misdemeanor convictions. She thought she would "fall over" when she heard that some of the convictions involved rape and domestic violence. She asserted that she would ensure the Appellant obeyed the law. She was not aware that the Appellant had been arrested seven separate times while the instant case was pending.

The forty-year-old Appellant testified that he began using marijuana when he was twelve years old and his parents "split up." His father moved to California, leaving him, his brother, and his mother. The Appellant began drinking alcohol when he was fifteen years old. At age seventeen, he smoked crack cocaine for the first time, and "[f]rom there, it has been just drugs, drugs, drugs." The Appellant dropped out of high school in the ninth grade. He said that throughout his childhood, he never stayed in one school for more than six months. He explained that his father sold marijuana, and they frequently moved.

The Appellant said that when he was thirteen years old, he was removed from his home by the Department of Children's Services (DCS) because he was neglected. He was placed in "TPS" and repeatedly ran away to go home. The Appellant said that when he was eighteen years old, he went to jail for rape of a child and was released when he was twenty-six.

The Appellant said that after his release from prison at twenty-six years old, he met Casteel, and they had a daughter. At that time, he "was doing good" and "worked all the time." He thought that his drug use might have been triggered by his break-up with Casteel or a work injury.

The Appellant said he did not have a driver's license and never completed a drug treatment program while incarcerated, but he obtained a general equivalency diploma and a graphic design degree. The Appellant acknowledged that he had received probationary sentences on prior occasions and that those probations had been revoked. Nevertheless, he asserted that he could complete probation or community corrections if a drug program was a condition of his release. The Appellant said that he usually had a job when not incarcerated, that he lost his job when he was caught driving without a license, and that he had a job if he were released. The Appellant said that he would accept any conditions imposed by the trial court.

On cross-examination, the Appellant acknowledged that he had been convicted of five felonies and sixteen misdemeanors, which included convictions of rape, possession of marijuana, driving on a revoked license, violation of community supervision for life, driving under the influence, violation of the sex offender registration and monitoring act, domestic violence, possession of a schedule II drug, violation of an order of protection, and possession of a schedule I drug. The Appellant acknowledged that since he had been arrested on the instant charges, he had been arrested on seven new charges. The Appellant conceded that he had received probationary sentences and a community corrections sentence in the past and that he had violated those sentences.

The trial court found that the Appellant was a Range I, standard offender convicted of a Class B felony; thus, the Appellant was subject to a sentence between eight and twelve years. The trial court applied enhancement factor (1), that the Appellant had convictions in addition to those necessary to establish the range; (8) that the Appellant failed to comply with other conditions of a sentence involving a release into the community, and (13)(A) and (C), that the Appellant had been "arrested seven (7) times for twelve (12) crimes while on probation and bond." Tenn. Code Ann. § 40-35-114(1), (8), (13)(A) and (C). Regarding mitigation, the trial court found that the Appellant's criminal conduct neither caused nor threatened serious bodily injury and that the Appellant had a troubled childhood that resulted in addiction problems which in turn resulted "in a lifelong criminal problem." Tenn. Code Ann. § 40-35-113(1), (13).

The trial court found that the Appellant lacked potential for rehabilitation and that he would not abide by the terms of probation. The court also found that society needed to be protected from the Appellant's further criminal conduct. The court noted that numerous measures less restrictive than confinement had been tried and that granting a sentence of full probation would depreciate the seriousness of the offense. Nevertheless, the trial court acknowledged that the offense was "not particularly enormous, gross, or heinous." The court imposed a sentence of eleven years in the Tennessee Department of Correction but denied any form of alternative sentencing.

This court reviews the length, range, and manner of service of a sentence imposed by the trial court under an abuse of discretion standard with a presumption of reasonableness. State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012); see also State v. Pollard, 432 S.W.3d 851, 859 (Tenn. 2013) (applying the standard to consecutive sentencing); State v. Caudle, 388 S.W.3d 273, 278-79 (Tenn. 2012) (applying the standard to alternative sentencing). In conducting its review, this court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the Appellant in his own behalf; and (8) the potential for rehabilitation or treatment. See Tenn. Code Ann. §§ 40-35-102, -103, -210; see also Bise, 380 S.W.3d at 697-98. The burden is on the Appellant to demonstrate the impropriety of his sentence. See Tenn. Code Ann. § 40-35-401, Sent'g Comm'n Cmts.

In the instant case, the Appellant is a Range I, standard offender, which makes him eligible for alternative sentencing. Tenn. Code Ann. § 40-35-102(6). However, because he was convicted of a Class B felony, he is not considered to be a favorable candidate for alternative sentencing. Id. Moreover, the Appellant received a sentence of eleven years, making him ineligible for probation. See Tenn. Code Ann. § 40-35-303(a). Therefore, the trial court did not err in denying the Appellant a probationary sentence.

Turning to the Appellant's community corrections claim, we note that the Community Corrections Act of 1985 was enacted to provide an alternative means of punishment for "selected, nonviolent felony offenders in front-end community based alternatives to incarceration." Tenn. Code Ann. § 40-36-103. Tennessee Code Annotated section 40-36-106(a)(1) provides that an offender who meets all of the following minimum criteria shall be considered eligible for community corrections:

(A) Persons who, without this option, would be incarcerated

in a correctional institution;

(B) Persons who are convicted of property-related, or drug- or alcohol-related felony offenses or other felony offenses not involving crimes against the person as provided in title 39, chapter 13, parts 1-5;

(C) Persons who are convicted of nonviolent felony offenses;

(D) Persons who are convicted of felony offenses in which the use or possession of a weapon was not involved;

(E) Persons who do not demonstrate a present or past pattern of behavior indicating violence;

(F) Persons who do not demonstrate a pattern of committing violent offenses.

The Appellant contends that he is eligible for community corrections under subsection (a). This court has previously held that "eligibility for probation is not required for consideration of community corrections under section (a)." State v. Johnson, 342 S.W.3d 520, 523 (Tenn. Crim. App. 2009). Regardless, an offender is not automatically entitled to community corrections upon meeting the minimum requirements for eligibility. State v. Ball, 973 S.W.2d 288, 294 (Tenn. Crim. App. 1998).

When determining a defendant's suitability for alternative sentencing, courts should consider whether the following sentencing considerations, set forth in Tennessee Code Annotated section 40-35-103(1), are applicable:

(A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

Additionally, "[t]he potential or lack of potential for the rehabilitation or treatment of the

defendant should be considered in determining the sentence alternative or length of a term to be imposed." Tenn. Code Ann. § 40-35-103(5). A defendant with a long history of criminal conduct and "evincing failure of past efforts at rehabilitation" is presumed unsuitable for alternative sentencing. Tenn. Code Ann. § 40-35-102(5).

The trial court determined that the Appellant had been released on probation in the past and had failed to comply with the terms of release. Further, the court found that the Appellant's rehabilitation potential was poor and that he was highly likely to reoffend. We conclude that the trial court did not abuse its discretion by denying a community corrections sentence.

### III.  Conclusion

The judgment of the trial court is affirmed.

_____
NORMA MCGEE OGLE, JUDGE